IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
PECOS DIVISION

| | | |
|---|---|---|
| SAMANTHA RODRIGUEZ FAVILA, Individually and as Parent and Next Friend of OMAR GARCIA and ANTONIO GARCIA, Minors and as Representative of the ESTATE OF REYES GARCIA RANGEL, IRENE RANGEL IBARRA and REYES MARTINEZ, | § § § § § § § | |
| Plaintiffs, | § § | No. 4:10-CV-00077 |
| v. | § § | |
| REEVES COUNTY, TEXAS (REEVES COUNTY DETENTION CENTER), THE GEO GROUP, INC., and PHYSICIANS NETWORK ASSOCIATION, | § § § § § | |
| Defendants. | § § | |

## AFFIDAVIT OF VERNON FARTHING III

| | |
|---|---|
| STATE OF TEXAS | § § |
| COUNTY OF LUBBOCK | § |

BEFORE ME, the undersigned authority, on this day personally appeared Vernon Farthing, III, who, being by me duly sworn, deposed as follows:

My name is Vernon Farthing, III. I am over the age of eighteen years, and am competent to make this affidavit. The factual statements contained herein are within my personal knowledge, true and correct.

Prior to December 2010, I served as president of Physicians Network Association, a professional corporation that provided health care personnel and services to inmates in various prison facilities. In December 2010, Physicians Network Association merged with Correctional Health Companies, and I am now a vice president with that entity. Attached hereto and incorporated herein for all purposes is a true and correct copy of the Medical Services Agreement between Physicians Network Association and Reeves County Commissioners Court for the Reeves County Detention Center Units R-1/R-2, located at 1560 West County Road 204, Pecos, Texas. Pursuant to this Agreement, Physicians Network Association has provided health services at the Reeves County Detention Center. Such contract was in full force and effect during the time that Reyes Garcia Rangel was incarcerated at that facility.

Section IV, subsection A, paragraph 7 of said Agreement provides, in pertinent part, that "the County will not impose upon PNA any obligation or duty, of any nature, to provide security supervision services for any inmates at any time."

Section IX of said Agreement provides that "in PNA's performance of its duties and responsibilities under this Agreement, it is mutually understood and agreed that PNA is at all times acting and performing as an independent contractor. The County shall neither have nor exercise any control or direction over the methods by which the PNA shall perform its work and functions other than is provided herein. Nothing in this Agreement is intended to or shall be deemed to constitute a partnership or a joint venture between the parties."

At no time has Physicians Network Association entered any agreements with defendant the GEO Group, Inc. concerning the operation of Reeves County Detention Center. Based upon my knowledge of the operations at Reeves County Detention Center, and at other prison facilities in which Physicians Network Association has provided services, I am aware that the GEO Group, Inc. is a private company contracted with Reeves County, Texas to manage the facility in which Reyes Garcia Rangel was incarcerated at the time of his death.

The affidavit of Dwight Sims, filed in support of defendant The GEO Group, Inc.'s motion for summary judgment, establishes that Reyes Garcia Rangel was assigned to the SHU on July 16, 2008 because of an altercation he had with correctional officers while being escorted, and that medical personnel made rounds at least daily in the SHU while he was housed there.

Physicians Network Association had no official custom or policy, as alleged in paragraph 29 of plaintiffs' original petition, of "placing persons such as Reyes Garcia Rangel, deceased in the SHU in order to keep them from seeking medical attention." Physicians Network Association did not place Mr. Garcia in the SHU. Moreover, by contract and as a matter of course, inmates in segregation continue to receive medical and mental health services in the Reeves County Detention Center.

Further deponent sayeth not.

_____
Vernon Farthing, III

SUBSCRIBED AND SWORN TO BEFORE ME this _16_ day of January, 2012, to certify which witness my hand and seal of office.

_____
NOTARY PUBLIC in and for the
State of Texas

2



LINDA KAY GREGG
Notary Public, State of Texas
My Commission Expires
May 05, 2015

# MEDICAL SERVICES AGREEMENT
## BETWEEN
## PHYSICIANS NETWORK ASSOCIATION
### AND
## REEVES COUNTY COMMISSIONERS COURT
### FOR THE
## REEVES COUNTY DETENTION CENTER UNITS R-1/R-2

**THIS AGREEMENT** is made and entered into by and between **PHYSICIANS NETWORK ASSOCIATION** ("PNA"), whose address is 1622 Mac Davis Lane, Suite A, Lubbock, Texas, 79401 and **REEVES COUNTY COMMISSIONERS COURT** ("County"), for the provision of medical and related services at the **Reeves County Detention Center R-1/R-2** (the "Facility") located at 1560 West County Road 204, Pecos, TX 79772.

**WHEREAS**, The County is in need of comprehensive healthcare services for Federal Bureau of Prisons Inmates housed at the Facility; and

**WHEREAS**, PNA has the resources, professional staff and expertise to provide comprehensive healthcare services at the Facility and desires to provide such services.

**IT IS HEREBY AGREED BETWEEN THE PARTIES:**

I. **DEFINITIONS**

    A. <u>BOP</u>: The Federal Bureau of Prisons.

    B. <u>BOP Statement of Work</u>: The document that sets forth the BOP requirements for the management of a low-security correctional facility for federal Inmates.

    C. <u>COTR</u>: Contracting Officer's Technical Representative. A Bureau of Prisons staffperson, designated in writing by the Contracting Officer, who assists the Contracting Officer Representative in the performance of duties. The extent of COTR responsibilities is delineated in writing by the Contracting Officer and will be provided to the County.

    D. <u>Contract</u>: the final negotiated Agreement between PNA and Reeves County for the provision of Health Services at R-1/R-2.

    E. <u>County</u>: Reeves County, a political subdivision of the State of Texas.

    F. <u>County Inmate</u>: An individual confined at the Facility under the auspices and authority of the County or under supervision of a County or District Court having jurisdiction in Reeves County, but shall not include an "Inmate" as defined above or any individuals not physically housed at the Facility.

G. <u>Health Services</u>: The health care services provided hereunder as required by the BOP Statement of Work. The term shall not include any security services of any nature.

H. <u>Health Services Administrator</u>: A PNA employee, as permitted by the Standards, with supervisory authority over the Health Services Unit.

I. <u>Health Services Unit</u>: The physical area in the Facility set aside for Health Services.

J. <u>Health Services Unit Supervisor</u>: A PNA employee designated on each shift to have supervisory responsibility for the operation of the Health Services Unit.

K. <u>IGA</u>: The Intergovernmental Agreement between the BOP and a County for detention services for Inmates.

L. <u>Inmate</u>: An individual confined at the Facility under the auspices and authority of the Federal Bureau of Prisons or other Federal detention agency, or under supervision of a Federal court.

M. <u>LBI</u>: The Limited Background Investigation required on all PNA and County employees pursuant to the terms of the BOP Statement of Work.

N. <u>Medical Director</u>: The PNA employee designated by PNA to have the principal responsibility for supervision of the medical services provided by PNA.

O. <u>Medical Services Proposal</u>: the PNA document proposing the provision of medical and related services to Reeves County Detention Center R-1/R-2, and incorporated herein by reference.

P. <u>Midnight Count Report</u>: The official numerical count of the number of inmates present at the Facility at the end of each day.

Q. <u>Operating Contract</u>: That contract between the County and a correctional management company relating to the operation, management, and maintenance of the Facility.

R. <u>Party</u>: Either the County or PNA.

S. <u>Standards</u>: American Correctional Association ("ACA") Standards for Adult Correctional Institutions, most current edition; Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") Ambulatory Care Standards; BOP IGA and Statement of Work; applicable federal, state and local laws and regulations; and accepted community standards of healthcare for Texas.

T. <u>Warden</u>: The individual appointed by the County to administer the Facility.

II.     **STANDARDS:** PNA shall provide the Health Services at the Facility in accordance with the Standards. However, if the Standards in effect as of the effective date of this Agreement are materially modified or amended, and as a result of such modifications or amendments PNA is obligated to provide more or different services than those required to be provided as of the effective date of this Agreement, including but not limited to changes in personnel staffing and coverage shown on Exhibit A hereto, then the procedure pursuant to Paragraph IV. A. 1.a., below, for adjusting the Per Diem Rate paid to PNA shall be available for use by PNA.

III.    **TERM OF AGREEMENT**

A.      This Agreement is for a term of four (4) years beginning effective March 1, 2007 and expiring on February 28, 2011, with three additional two (2) year option periods, unless sooner terminated as provided herein.

B.      This Agreement may be renewed for subsequent periods after the initial agreement period upon mutual agreement of the parties. This Agreement will be subject to renegotiation regarding its renewal, a minimum of ninety- (90) days prior to its expiration and if no agreement is reached, shall then expire.

IV.     **PNA DUTIES:** Physicians Network Association (PNA,) shall deliver health services to Federal Bureau of Prisons inmates housed in the R-1/R-2 Units of the Reeves County Detention Center. PNA shall provide all necessary personnel, equipment, supplies, materials and services to perform the health care duties outlined in the CAR 6 RFP and incorporated herein by reference. PNA acknowledges that any subcontract is subject to the IGA between the County and BOP.

A.      Administrative

1.      PNA will provide for and deliver Health Services to the Inmates at the Facility pursuant to and in compliance with this Agreement, the IGA and the BOP Statement of Work. In the event a conflict exists between the terms of the previously listed documents, the BOP Statement of Work will govern.

a. No amendment or modification to the IGA or Operating Contract, including a material change to the scope of services, that becomes effective after the execution of this Agreement by PNA will be binding upon or obligate PNA to provide any goods or services of any nature, unless and until: (i) the County has provided PNA with a full and complete description of such amendment or modification; and (ii) PNA has had a reasonable time to evaluate the financial impact upon PNA of such amendment or modification; and (iii) the County has discussed with PNA and received PNA's requested change in the compensation to be paid to PNA, if any, as a result of the proposed amendment or modification. In the event that the change in compensation requested by PNA is not agreed

*Medical Services Agreement R-1/R-2 CAR 6 - Reeves County Commissioners Court - January 2007*
*The information contained herein is proprietary and confidential and not for public dissemination.*

3

to by the County, then either party would have the right to terminate an Agreement upon thirty (30) days written notice to the other party.

2.     PNA will design and implement written policies, procedures, and protocol for the Health Services in compliance with the BOP IGA and Statement of Work. PNA will provide the County copies of such written policies, procedures and protocol.

3.     PNA will plan, implement, direct, and control all clinical and administrative aspects of the Health Services program.

4.     PNA will cooperate with the County to obtain ACA accreditation at the Facility, if required, but PNA shall not be obligated to pay any unusual or extraordinary fee or expense in the course of such cooperation. All standard, typical and customary fees, costs and other expenses incurred by PNA in its cooperation with the County's efforts to acquire ACA accreditation for the Facility shall be the sole responsibility of PNA.

5.     PNA will achieve JCAHO accreditation within twenty-four (24) months of the effective date of this Agreement and shall maintain continual compliance with JCAHO accreditation standards thereafter during the remaining term of the Contract or any extension thereof. All standard, typical and customary fees, costs and other expenses incurred by PNA in the acquisition of JCAHO accreditation shall be the sole responsibility of PNA.

a.) When accreditation time nears, PNA will perform two mock audits, one six months in advance and one approximately one month before accreditation. Corporate accreditation staff will be on-site at RCDC to complete files and correct deficiencies, and will be present for the accreditation process.

6.     PNA will participate in the facility Contractor Quality Control (QCP) program as outlined in the BOP Statement of Work.

7.     While PNA acknowledges that it is obligated to medically monitor inmates receiving Health Services hereunder (such as periodically taking vital signs, inquiring into general state, and offering toileting), the County will not impose upon PNA any obligation or duty, of any nature, to provide security supervision services for any inmates at any time.

8.     PNA understands the Government may reduce the Reeves County invoice or otherwise withhold payment for any individual item of nonconforming medical service observed as specified in the IGA.

**B.**   **Personnel**

1.   PNA will provide Health Services personnel who meet the minimum qualifications required by the BOP IGA and Statement of Work, including background checks and drug testing requirements. The County, at its sole cost and expense, shall perform the LBI on each PNA applicant. The results of any LBI conducted by the County on any PNA employee or potential employee, shall be provided and disclosed only to the corporate staff of PNA, who shall be responsible for contacting the employee or potential employee in question regarding such results, and insuring that any discrepancies in the results are dealt with in compliance with the resolution procedures set forth in the IGA or Statement of Work. PNA shall provide to the County documentation on each such employee and/or coordinate with the County to make certain such employees meet the minimum qualifications set forth above. At PNA's option, the Warden may be involved in the interviewing process for the Health Services Unit Administrator and any other PNA employees who will work at the Facility, but such involvement shall be limited to that of a consultant to PNA. The County shall have no authority to hire, accept, train, or reject any applicant for employment with PNA.

2.   PNA shall provide licensed or certified personnel who are eligible and authorized to work in Texas to provide Health Services. PNA agrees to incorporate and enforce the BOP "Standards of Conduct."

3.   PNA will provide and distribute a written job description to each employee that clearly delineates his/her assigned responsibilities. PNA will monitor performance of staff to verify performance in accordance with these job descriptions, other provisions of the Contract, and the Standards.

4.   PNA shall grant the County the right to deny admittance to the Facility to any PNA personnel after first providing PNA with a reasonable basis for such denial. In the event a PNA employee is denied admittance, PNA shall provide alternate personnel to supply the Health Services. Admittance to the Facility of such alternate personnel is also subject to County approval.

5.   Credentials for all PNA personnel performing Health Services shall be on file at the Health Services Unit. The records shall be made available upon request to the County or the County's designee. These files shall include copies of current state licenses, proof of professional certification, TB testing, proof of professional liability coverage and all records required by the BOP IGA and Statement of Work.

6.   PNA shall be solely responsible for its employees including all taxes, employment withholding, social security, or other wages for its employees. PNA will indemnify the County for any such taxes, costs or fees that the County incurs related to PNA employees.

*Medical Services Agreement R-1/R-2 CAR 6 - Reeves County Commissioners Court - January 2007*
*The information contained herein is proprietary and confidential and not for public dissemination.*

5

7.     PNA will ensure that its staff (both employees and contract personnel) complies with the County's facility operational procedures, including sign-in and sign-out procedures.

8.     PNA acknowledges the requirement to comply with the Federal Wage Determination rates.

C.     <u>Employee Training and Orientation</u>

1.     PNA will provide Health Services Unit-related orientation and training for all of its personnel providing Health Services, as required by the BOP IGA or Statement of Work.

2.     PNA will establish a medical library at the Facility for use by the Health Services staff, to include basic reference texts as well as a current medical dictionary, a Physician's Desk Reference and current Nursing Practice textbook.

3.     The County shall provide all PNA personnel with the basic forty-hour Facility orientation as required by the BOP IGA or Statement of Work, and any related annual required Facility training.

D.     <u>Space, Equipment, and Commodities</u>

1.     PNA shall, at its sole cost and expense, provide all consumable or disposable medical supplies required by the BOP IGA or Statement of Work. PNA shall be obligated to purchase all equipment required by such documents that is not currently available for use by PNA at the Facility as of the effective date of this Agreement, with the exception of equipment required to complete the Health Services Unit renovation that the County has agreed to purchase.

a. PNA will be responsible for medical and office supplies and equipment not currently existing in the Facility, as it determines necessary. PNA will not supply examination gloves for Facility security staff. PNA will furnish medical oxygen and provide hazardous waste disposal per OSHA guidelines.

2.     PNA shall only be responsible for the maintenance, repair, and replacement of that equipment that is purchased or supplied by PNA. Additionally, PNA shall be responsible for any damages to the Facility, including damages to any equipment, caused by PNA employees or agents.

3.     Pursuant to PNA's obligations to provide Health Services to the Facility, and in connection with all of PNA's obligations pursuant to this Agreement, during the term of this Agreement, PNA shall have the right, at its own expense, to install items of movable machinery and equipment in or upon the Facility,

*Medical Services Agreement R-1/R-2 CAR 6 - Reeves County Commissioners Court - January 2007*
*The information contained herein is proprietary and confidential and not for public dissemination.*

6

which items shall be identified by tags or other symbols affixed thereto as property of PNA. All such items so identified shall remain the sole property of PNA, in which the County shall have no interest, and all such items may be modified or removed by PNA at any time, provided that PNA shall repair and restore any and all damage to the Facility resulting from the installation, modification or removal of any such items. All items of movable machinery and equipment in or upon the Facility that are not so identified by PNA as required herein shall be deemed to be the sole property of the County. Nothing in this Agreement shall prevent PNA from purchasing or leasing items to be installed in or upon the Facility, under a conditional sale or lease with option to purchase contract, or subject to a vendor's lien or security agreement as security for the unpaid portion of the purchase price thereof, provided that no such lien or security interest shall attach to any part of the Facility. At the termination of PNA's services under this Agreement, the County shall have the right to purchase from PNA any equipment used in the Facility and owned by PNA at a price to be mutually agreed upon by the County and PNA. PNA acknowledges that its right to bring machinery and equipment upon the premises of the Facility is subject to the reasonable security requirements of the Facility and the County's approval, which shall not be unreasonably withheld.

E.      **Healthcare Records**

1.      PNA shall maintain healthcare records in compliance with the BOP IGA, Statement of Work and the Standards. The healthcare records will be timely, complete, accurate, and comply with the BOP Program Statement 6090, Health Information Management, in preparing, formatting, documenting, maintaining, releasing and all medico-legal aspects of an inmate's medical record, including utilizing forms consistent with those used by the BOP. All health records and files are the property of BOP, and PNA shall maintain the confidentiality of such records at all times. Additionally, the Parties acknowledge that all information relating to Health Services provided pursuant to this Agreement shall be subject to, and protected by, the provisions of the Health Information Portability and Accountability Act ("HIPAA").

2.      PNA acknowledges and accepts the requirement to utilize the SENTRY and SMD/MDS TRM systems as per Program Statement 6031, Patient Care.

3.      PNA shall maintain proper confidentiality of medical records at all times during any County or outside agency review.

4.      PNA shall supply medical record folders, consistent with the specification provided by the BOP, only for those inmates who are new designations into the Facility, or in cases where transferred medical records cannot be located. The BOP shall provide the County and/or PNA all applicable BOP forms necessary to document an inmate's medical record.

*Medical Services Agreement R-1/R-2 CAR 6 - Reeves County Commissioners Court - January 2007*
*The information contained herein is proprietary and confidential and not for public dissemination.*

7

5.     PNA shall comply with the Health Services Program Statements regarding transfers and medical designations of inmates assigned to the Facility.  Medical designations to BOP Medical Centers or other government facilities will be at the sole discretion of the BOP.

F.     Health Care

1.     PNA will provide Health Services twenty-four (24) hours per day, seven days per week, in accordance with the staffing set forth in Exhibit A.  PNA will provide Health Services to all Inmates in accordance with the Standards.  PNA will provide physician on-call availability twenty-four (24) hours a day.

2.     Subject to the terms and conditions of this Agreement, Health Services for inmates will include, but not be limited to: routine health care; nursing care; emergency care; medical, mental health and dental care; treatment of acute and chronic conditions that can be managed on-site; intake health screenings; TB testing (and isolation, if necessary;) identification and treatment of communicable disease; physical examinations and all other care outlined in the BOP IGA and Statement of Work, and further described below.  All care will provided with the highest level of confidentiality and privacy attainable.

3.     If, in the opinion of the Health Services Administrator or his/her designee, the inmate cannot be properly treated in the Facility, the inmate may be referred to a licensed community facility that can provide the necessary treatment and which has been mutually agreed upon by the County and PNA for provision of such services.   Admissions that arise from emergency situations are to be reviewed by the Health Services Administrator or his/her designee within twenty-four (24) hours of admission.  PNA shall comply with all BOP requirements for notification and documentation relating to inmate care.

4.     In the event of an inmate's death, PNA will collect any necessary information required for a mortality review, conduct the review per PNA policy, and forward the report to the County.

5.     PNA shall cooperate with and/or assist the County in complying with all security measures required by the Standards, including the IGA and BOP Statement of Work.  However, PNA is not obligated to provide security services for any inmates pursuant to this Agreement.

6.     On-Call Health Care: Physicians, providers and nurses at the facility will be available for on-call duties.  Health care staff will be on-call for consultation or return to the facility at all times.  In addition, PNA's Medical Director, our numerous staff physicians and providers, corporate nurses and Psychologist, are available at all times for telephone consultation.

7.    Quality Assurance and Peer Review: A designated employee will oversee Quality Improvement and be responsible for collecting and organizing QA/QI data. A monthly QI audit is performed which includes chart review.

a. County Representatives, the Warden and BOP Administration may to participate in the QI process.

b. Peer review will be performed according to the standards by PNA for all doctorate-level and mid-level practitioners. PNA has a group of Board Certified physicians who perform this task for us.

c. PNA will share QI data with the County, and share peer review information to the extent permitted by law.

d. PNA shall employ consultants who have BOP expertise to supervise audit and accreditation activities.

8.    Inmate Intake Screening: will be performed on arrival at the Facility by trained healthcare personnel: if circumstances prevent the immediate performance of the intake screening, it will be completed within twenty-four hours of arrival. The screening will include: inquiry into all aspects of health care required by ACA Standards; scheduling of necessary evaluations or tests; orientation to health services at the facility, and documentation of current medications. The inmate may be scheduled for further health care, treated immediately, or referred to general population. The receiving screening will be included in the inmate's health record. The Inmate will also receive instructions on accessing medical, mental health and dental care and provided a Handbook, prepared in coordination with the County, which outlines access to facility health care.

9.    Health Appraisal: A health appraisal will be conducted within fourteen days of the inmate's arrival and periodically thereafter in accordance with ACA Standards. The health appraisal will include a review of past medical history and the health record. Any further care required will be ordered or completed at this time, and if appropriate, the inmate will be referred to the Chronic/Special Needs Clinic system.

10.    Primary and Preventive Medical Care: Primary health care occurs through the various levels of Sick Call and through of inmate education opportunities. Preventive care also includes education and Infection Control, as well as Chronic Clinic involvement. Inmates will receive oral hygiene instruction. Testing and treatment for the prevention or control of communicable diseases, such as TB and HIV, will be ordered as appropriate. Vaccinations and immunizations will be given to identified and high-risk inmates. These may include flu shots, Pneumovax, INH, etc.,) according to national treatment guidelines. The Infection Control Nurse at will be responsible for administration of the program.

*Medical Services Agreement R-1/R-2 CAR 6 - Reeves County Commissioners Court - January 2007*
*The information contained herein is proprietary and confidential and not for public dissemination.*

9

11,    Nurse Sick Call:  Sick call requests will be triaged daily, logged, and the inmate scheduled to be seen immediately by a nurse, or scheduled for further evaluation by a physician/extender, dentist or mental health provider.  Sick call will be performed in the Health Services Unit or cell-side as necessary, five days a week.  Scheduling of Sick Call will be coordinated with Administration.

12.    Doctor/Provider Call: the Physician, Mid-Level Provider, Dentist and Mental Health staff will perform various Provider Clinics.  Necessary care, to include medications, laboratory and diagnostic tests and medical diets, will be ordered when necessary. Inmates with chronic conditions or special needs will be seen as needed, but not less than every 180 days.  Scheduling of Provider Call will be coordinated with Administration.  All routine medical care will be conducted in the Health Services Unit when possible.

13.    Specialty Clinics ("Chronic Clinic"):   Inmates with chronic medical conditions or special needs (hypertension, HIV-positive, mental illness or wheel-chair bound, for example,) will be seen by a provider on a regularly scheduled basis, but no less than every 180 days.  Condition-specific education, appropriate medical treatment, special diets and medication will be provided as necessary.  A Chronic Clinic Nurse will be designated to manage this population.  Treatment plans, reflecting the BOP Clinical Guidelines, exist for primary chronic conditions.

14.    Observation Care: PNA will provide routine nursing care, chronic care and/or convalescent care as indicated using designated 'observation' beds.  This type of care does not require the creation of a separate inpatient health record or special licensing.

15.    Tertiary Medical Care: PNA will provide all necessary medical services, at our expense, (with the exception of purchasing prescribed medications and "lab studies,") either at the facility or an approved off-site location.  These services include, but are not limited to, specialty medical consultations, diagnostic testing, surgical and outpatient procedures, hospitalization, and physical therapy.  The County will be responsible for all routine transportation and required security associated with these services.  PNA will be responsible for the cost of all emergency medical transportation.

16.    Outpatient Referrals and Consultations:   PNA will schedule specialty treatment by off-site medical providers in accordance with Standards and BOP Policy.  The facility Physician will review all consultation recommendations, which will be approved by PNA Utilization Management staff. Consultations will be ordered in a timely fashion, as medically indicated, and all off-site referrals will be logged.  All necessary specialty care will be provided (e.g.: cardiology, ophthalmology, oncology, etc.,) as determined by the Medical Director and PNA Utilization Management.   PNA's corporate staff will meet regularly with providers to evaluate service delivery.   When possible, consultations and

procedures may take place on-site. Telemedicine may be implemented on a limited basis, but to enhance, not to replace, direct care.

17. Hospitalization: When an inmate requires a higher level of care, he may be hospitalized at a licensed community facility. PNA will be financially responsible for all costs. An inmate with severe or persistent mental illness, which is not responding to treatment in the Facility, may be transferred to an approved BOP institution. PNA is not responsible for treatment or hospitalization of inmates who become ill or injured as an escapee; or when housed at locations away from the Facility.

18. Physical Therapy and Rehabilitative Medicine: these services will be provided as medically necessary, and when possible, in the correctional facility using trained healthcare staff or specialists brought on-site.

19. Inmate Health Education: Education is delivered in a variety of ways: verbally; through printed, audio and video materials; organized educational activities; and during health encounters. Inmates receiving treatment or medications requiring Informed Consent will receive additional education, and Chronic Clinic/Special Needs patients will receive education during physician encounters. Information will be obtained from outside sources (Texas Department of Health, the CDC,) and made available in the Health Services Units.

a. Facility Staff: On request, PNA will provide staff to assist with the Facility training program. PNA shall also provide the Pathogen Exposure Prevention Plan for the Facility, updated annually, and provide regular training and instruction on Standard Precautions to Facility staff.

b. PNA Staff: In-service training during monthly staff meetings, conferences, videos and printed materials are examples of the methods of training provided to staff.

20. Mortality and Morbidity Review: In the event of an inmate death, PNA will cooperate fully with BOP and the County and will complete a mortality review in accordance with BOP's policies and procedures, providing pertinent data, reports and support, in a manner that meets federal and state requirements.

21. Agency Required Documentation: Any and all reports and documents required or requested by BOP and the County will be provided in a timely manner. PNA understands that the work product created during the contract period remains the property of BOP.

22. Facility Employee Health Care: PNA will, when requested by Administration, provide limited health care services to Facility employees. These services will include:

*Medical Services Agreement R-1/R-2 CAR 6 - Reeves County Commissioners Court - January 2007*
*The information contained herein is proprietary and confidential and not for public dissemination.*

11

a. Assistance with occupationally related accidents and illnesses: PNA will provide 'first responder' service for accidents or injuries, including triage, treatment and referral; and communicate health information to off-site providers, if required.

b. OSHA Compliance: PNA will ensure all health-related activities meet OSHA requirements, and will be a partner on the Environmental Safety and Health Committee.

c. Medical Emergencies: PNA will provide emergency medical services to facility staff. Emergency care shall consist of "initial response" by Health Services personnel and emergency triage, stabilization and referral to personal physician, local hospital or otherwise in compliance with Facility policies and procedures.

d. PNA's administration of the Facility Employee Health Program, if implemented at the Facility, will be covered under a separate contract. It would include a vaccination/immunization program, employee physicals and other activities as agreed upon.

e. Education: PNA will assist in developing health training for Facility staff, and will participate in the Orientation as presenters, if requested.

23.  Prostheses:  PNA will be financially responsible for all medically necessary dentures, dental appliances, and medical prosthetic devices except as follows: if the transferring institution has initiated a procedure for either a medical or dental device and the device has been completed, the device and case file will be provided to PNA. Any further expenditure is the responsibility of PNA.

24.  Inmates in Segregation: health services to inmates in administrative or disciplinary segregation will be provided in the segregation area when feasible. Health Services staff will assess inmates placed in segregation for conditions that require additional monitoring. Segregated inmates shall be seen daily by a health care worker and afforded the opportunity to request Sick Call. Medications will be delivered cell-side, and inmates in segregation will be seen by Mental Health Staff every thirty days of confinement.

25.  Inmate Food Service and Barber Shop Workers:  Physical exam and medical clearance will be provided for inmates selected for Food Service and Barber Shop work.

26.  Immunizations for Inmates: PNA will provide immunizations as required by current treatment guidelines, and will document administration according to the Standards.

*Medical Services Agreement R-1/R-2 CAR 6 - Reeves County Commissioners Court - January 2007*
*The information contained herein is proprietary and confidential and not for public dissemination.*

12

27.     Utilization Review:   The Corporate UR Committee (URC) evaluates performance, delivery, trends and costs.  The Corporate URC reviews all requests for care within seventy-two hours of receipt.  All reports and documentation are available for County or BOP inspection at any time.

28.     Co-Payment:   A Co-Pay System will be implemented, if requested by BOP or the County.

29.     Transportation: Emergency transportation (such as ambulance service,) will be provided by PNA: the County will provide routine or non-emergent transportation.

30.     Security:  The County will provide security for PNA's employees and agents consistent with the security provided other staff at the Facility.

31.     Policy and Procedure Manual and Treatment Protocols:  written to mirror JCAHO and ACA Standards and meet state practice standards.

32.     Communicable Disease and Infection Control:  Communicable disease will be handled in accordance with and current CDC/OSHA/JCAHO guidelines and ACA standards.   PNA will implement an infection control program to include, but not be limited to, concurrent surveillance of patients and staff, prevention techniques and treatment and reporting of infections in accordance with the Standards.  An Infection Control nurse will be designated to manage this program element.  Treatment plans exist for tuberculosis, HIV, Hepatitis A, B and C.  Biohazardous waste will be handled according to OSHA/CDC regulations.

  a. Tuberculosis will be aggressively monitored.  Inmates will be screened for TB at and receive a PPD or chest x-ray at intake.   Continuing surveillance will be in accordance with the CDC/MMWR Program Statements and the BOP Treatment Guideline Statements.

  b. HIV/AIDS will be monitored, using DHHS and USPHS guidelines and appropriate BOP Program Statements.  Testing will be done at inmate request or physician recommendation and treatment offered to infected inmates.   Certified staff will perform pre- and post-test counseling. Immunizations appropriate to the condition will be administered according to current treatment guidelines.

  c. Immunizations (influenza, Pneumovax, etc.,) will be given to inmates meeting appropriate criteria (e.g.: chronic/communicable illness, frail elderly,) established by the U.S. Preventive Health Task Force.

  d. PNA will follow the HIV and Hepatitis guidelines outlined in the most current BOP Program Statements and Treatment Guidelines.

G.  **Dental Care**

1.  **Dental Services:** PNA will provide customary and necessary diagnostic, preventive, restorative and rehabilitative dental care in accordance with the Standards. The goal of treatment will be to provide basic oral health care that will: diagnose existing conditions; provide relief from pain and elimination of infection; preventive care; education, and ultimate, restoration or maintenance of adequate dental functions and mastication. All dental services will be provided on-site when possible, using the staffing as indicated in Exhibit A.

2.  **Dental Screening,** performed by appropriately trained health services staff within seven days of arrival, if not performed at the BOP Receiving Facility or within the past one hundred eighty (180) days;

3.  **Dental Examination,** by a licensed dentist, performed within twelve months of admission, supported by x-rays and other diagnostic tools, if necessary;

4.  **Treatment,** not limited to extraction, will be provided according to the dentist's judgment that care is necessary for maintaining the inmate's health status. Dentists licensed in the State will perform dental treatment. Treatment will be prioritized and provided in accordance with BOP standards. Dental Assistants will perform related duties including scheduling and assist the Dentist during Provider Sick Call, which will occur one day a week in the Facility. All treatment will be provided according to an Individual Treatment Plan.

5.  **Preventive Care:** involves prevention, treatment and education. Periodic examinations and treatments (e.g.: fillings, root scale planing,) will be provided for a variety of conditions that interfere with mastication. Inmates will be expected to participate in their own oral care and will receive education and instruction through health encounters and educational materials.

6.  **Restorative and Rehabilitative Care:** is available for eligible inmates, and will include more complex treatment, including ordered oral surgeries, dentures, etc., with the goal of restoring oral health and mastication.

7.  PNA will develop a protocol for treatment of dental emergencies with a response time of twenty-four (24) hours from the occurrence.

H.  **Pharmacy Services**

1.  PNA shall provide all pharmacy-related services (ordering, storage, distribution, documentation) in compliance with the Standards and the Texas Board of Pharmacy and Federal Drug Enforcement Administration.

2.  PNA shall obtain and maintain any necessary licenses to provide pharmacy services at the Facility.

3.     The County shall be responsible for the provision and cost of all prescribed medications.

4.     The County shall ensure on-call coverage by a licensed pharmacist twenty-four (24) hours/day, seven (7) days/week for emergency needs. PNA shall provide staff for pill call distribution in accordance with Exhibit A and to meet special inmate needs. Staff will provide inmate instruction on medication usage and compliance, and ensure an Informed Consent is obtained for inmates receiving psychotropic medications.

5.     PNA shall provide and is responsible for the cost of all over-the-counter medications ordered by Health Services Staff for non-indigent inmates. PNA is not responsible for over-the-counter products purchased from the Commissary by Inmates or those prescribed by an outside provider.

6.     PNA shall require providers to follow the PNA formulary and to provide generic medications whenever possible.  PNA shall store and distribute all medications in compliance with state and federal regulations and the Standards.

7.     Supplies

a. PNA shall provide hypodermic supplies to include needles, syringes, and disposal containers that meet Occupational Safety and Health Act (OSHA) requirements.

b.     PNA shall be responsible for appropriate disposal and/or destruction of needles and syringes, as well as all of the medical hazardous waste.  PNA's medical waste disposal subcontractor will create all documentation required by the Standards and such documentation will be maintained by PNA and made available to the County.

c.     PNA shall indemnify the County for any costs, fees, or expenses incurred due to PNA's breach of the obligation set forth in Section 6b.

8.     PNA shall provide a Medication Administration Record for each Inmate receiving medication.  The record will include the name of the practitioner ordering the medication and all other necessary information required for a medication order.

9.     The County shall provide a licensed consultant pharmacist, as required by the Standards, but no less than annually, to conduct inspections of all Facility areas where medications are maintained, to determine compliance with the Standards, with the inspection to include but not limited to review of expiration dates, storage and medical records.  The County shall provide PNA a copy of the inspection report.

10.    PNA shall ensure that Inmates do not have unauthorized access to the Pharmacy and will indemnify the County for any damages incurred if the inmates gain unauthorized access.

11.    Medication administration will occur at a minimum twice daily. All medications shall be securely stored and inventoried. Medications approved by the Administration may be kept-on-person by the inmates. Medication will be distributed cell-side for segregation and other special management inmates.

I.    <u>Laboratory and Diagnostic Services</u>

1.    All laboratory services provided to Inmates shall be the financial responsibility of the County. "Lab services," as relating to this contract, are tests of body tissues or fluids that can be drawn or taken on site and sent to a referral laboratory. PNA shall provide Clinical Laboratory Improvement Amendments ("CLIA")-waived on-site diagnostic tests.

2.    Emergency laboratory work shall be performed at a local hospital or accredited laboratory near the Facility to the extent reasonably available under the relevant circumstances. Results shall be immediately forwarded to the requesting provider and a written report shall follow within twenty-four (24) hours

J.    <u>Radiology Services</u>   Routine radiology services for all Inmates housed at the Facility, to include all fluoroscopy and special studies such as MRI, CAT Scans, and ultrasounds, are the financial responsibility of PNA. PNA will maintain, inspect and calibrate all on-site equipment (if such exists.) PNA will use mobile x-ray services to the extent possible.

K.    <u>Referrals, Hospitalization, and Outpatient Care</u>

1.    PNA will provide referrals to off-site healthcare providers that are consistent with the Standards.

2.    All referrals, procedures, hospitalization or outpatient care requiring pre-authorization by BOP will be managed by PNA according to the BOP IGA and Statement of Work. All routine referrals for care outside the Facility to health care providers shall be approved by the PNA Utilization Review Department and designated personnel prior to scheduling.

3.    PNA's personnel will meet regularly with representatives from the designated hospitals and other providers to coordinate the referral of Inmates. Policies and procedures shall be developed regarding referral methods, scheduling, and transportation, reporting of test results, medical records, acute care hospitalization, and patient follow-up.

L.    **Optometry and Ophthalmologic Services.**  PNA will make arrangements for optical services as needed, to include providing examinations and furnishing prescription eyeglasses for all Inmates housed at the Facility, whose vision is 20/50 or greater in any eye.  PNA will not provide contact lenses unless medically indicated.  Inmates with diabetes or other health conditions will receive regularly scheduled ophthalmology appointments and appropriate tests.

M.    **Emergency Medical Services.** PNA will provide emergency medical services in compliance with the BOP IGA and Statement of Work, to include the following: written policies and procedures concerning emergency transfer and transportation of inmates; arrangements for emergency twenty-four (24) hour on-call physician coverage; coordination with Facility security personnel for transportation when the immediate transfer of an inmate is indicated; emergency treatment for visitors and staff consisting of "initial response" by Health Services personnel, emergency triage, stabilization and referral to personal physician, local hospital, or otherwise in compliance with Facility policies and procedures; and physician care, when appropriate.  PNA will also provide: twenty-four hour on-call physician, dentist and mental health assistance; rapid response to emergency medical situations in the facility; in-service training on emergency procedures; written policies and procedures concerning emergency transfer and transportation of inmates; additional personnel from other PNA facilities available for extended situations; and a Facility Disaster Drill to be organized and practiced according to BOP guidelines, to ensure staff is prepared for larger-scale emergencies.  PNA is financially responsible only for inmate ambulance transportation and inmate off-site emergency care.

N.    **Mental Health Services**

1.    PNA will provide limited routine on-site mental health services to Inmates using the staffing pattern outlined in Exhibit A.  Services will be in compliance with the BOP IGA and Statement of Work, to include:

   a. Written policies and procedures regarding care and treatment:

   b. Arrangements for emergency twenty-four (24) hour on-call crisis services:

   c. Initial intake screening, performed by trained staff as part of the medical intake screening process, on arrival at the Facility: if circumstances prevent the immediate performance of the intake screening, it will be completed within twenty-four hours of arrival.     It will ensure that any immediate mental health needs (detoxification, suicidality, necessary medications, current mental health complaints) are addressed:

   d. Mental Health appraisal for newly committed inmates by a mental health professional within fourteen-days of arrival as per the Standards.

This includes a more in-depth exploration of the inmate's mental health history.  Intrasystem transfers will receive a psychological update if a full appraisal has already been done:

e. Referral, evaluation and treatment of referred inmates, as necessary. Referrals for evaluation from an appraisal will occur within fourteen days of referral request date and will include a thorough history and development of an Individual Treatment Plan if necessary:

f. Mental Health sick call:

g. Assistance with the development of a Facility Suicide Prevention Plan and training program:

h. Development of Seclusion and Restraint Policies:

i. Transfer of inmates to an appropriate BOP facility when warranted:

j. Psychotropic medications, Informed Consents and treatment plans for identified inmates:

k. Monthly QI audits to assess medication compliance and continuity of care;

l. Case Management services, with individual treatment plans, for inmates receiving psychological services:

m. Mental Health Chronic Clinic: inmates with identified mental illness will be seen no less than every ninety days:

n. Health Record: all activities will be documented in the medical record, SENTRY, or the SMD/MDS TRM, as appropriate.  Quality improvement activities will take place monthly, with monthly and quarterly meetings to discuss service delivery.   PNA's Director of Mental Health Services, a licensed Psychologist, will supervise the program:

o. Medication management and monitoring, as clinically indicated; provision of a psychiatric medication formulary; medication distribution; and program management by the Physician; medications will be distributed in accordance with the standards; delivery of medications cell-side when necessary.  Medication Administration Records will be audited monthly; clinical staff will be notified when an inmate misses three consecutive doses of psychotropic medication:

p. Assessment, diagnosis and treatment (including Chronic Care Clinic): as necessary, approved forms will be used, and diagnostic tests may be

*Medical Services Agreement R-1/R-2 CAR 6 - Reeves County Commissioners Court - January 2007*
*The information contained herein is proprietary and confidential and not for public dissemination.*

18

administered.  Treatment will include short- and long- term individual and group therapies, classes, audio, visual and reading materials.  Mental Health Chronic Clinic and Sick Call will be used to gauge medication effectiveness and treatment appropriateness.  Regular staffing of patients will occur.  All inmates in treatment will have an individualized treatment plan prepared:

q. Scheduled segregation visits, management of suicidal inmates: All inmates in segregation will be evaluated by Mental Health Staff every thirty days, regardless of reason for segregating.  Health Services Staff will assist Administration in ensuring inmates entering Segregation have no mental or physical prohibitions.  Inmates placed on suicide watch will have treatment coordinated by mental health staff.  No inmate may be placed on, or removed from, suicide watch without notification and participation of the mental health providers.  Inmates placed on or removed from suicide watch will have written documentation placed in their charts.  Inmates on suicide watch will have contact with other health professionals daily, such as at medication pass.

r. A regular audit of a sample of patient charts of inmates on the mental health caseload will be performed monthly to assess medication compliance and continuity of care as part of the QI program.

O.     <u>Inmate Intake</u>

1.     A Health Services employee will medically screen all Inmates on arrival at the Facility, with the findings entered into the inmate's health record.   If circumstances prevent the immediate performance of the intake screening, it will be completed within twenty-four hours of arrival.  The preliminary screening shall include areas of concern identified in the Standards, such as: current health status, physical appearance, evidence of intoxication, current medications, dental status, and chronic health problems.

2.     All inmates shall be screened for tuberculosis within forty-eight (48) hours of intake and thereafter according to the Standards.  Screening shall consist of either a PPD (Mantoux method) or chest x-ray.

3.     PNA will assist in the inmate Orientation to ensure understanding the procedures for gaining access to Health Services.

P.     <u>Health Appraisal.</u>  PNA shall complete a health appraisal within fourteen (14) days of admission, per ACA standards, for both inter- and intra-system transfers, and shall maintain a copy in the inmate's health record.  Tests and examinations will be updated as needed.  PNA shall develop an individual treatment plan for each Inmate who requires on-going care based on an assessment of the inmate's needs as outlined in the Standards.

Q.   Financial Records

1.     PNA shall maintain books, records, and documents relating to the services provided at the Facility hereunder, in accordance with generally accepted accounting procedures and practices, which the County may review and/or audit upon reasonable request.  Said items shall be maintained for a period of time sufficient to comply with the Standards.

2.     Copies of all records, documents, reports, notes or other written material, either prepared or maintained by PNA for the administration and management of this Agreement will be turned over to the County upon cancellation, termination or completion of this Agreement.

R.   Staffing

1.     PNA shall provide the Health Services at the Facility by providing at least the minimum staffing and shift coverage shown in Exhibit A, attached hereto and incorporated herein by reference.  Except as otherwise provided herein, Exhibit A may only be changed by written mutual agreement of PNA and the County.  Overtime or temporary PNA employees may temporarily fill any PNA staffing vacancy, so long as the person holding such position meets the minimum requirements of the position and the security requirements of the Facility.  PNA shall be responsible to provide to the County supporting documentation of such overtime, temporary employees and qualifications.  The County or its designee shall have no right or authority to adjust PNA's Per Diem Rate payment (a) where the County's or its designee's actions have prevented PNA from filling the vacancy, or (b) for any vacancy that arises in a position that PNA is not required to provide pursuant to the staffing and shift coverage shown in Exhibit A, attached hereto.

2.     In the event that the BOP, the County or any other entity assigning inmates to the Facility assesses charges or backcharges the County for the costs relating to any vacancy in staffing and shift coverage required by Exhibit A for the provision of Health Services hereunder, PNA shall promptly pay to the County any such costs.

3.     Only credentialed or licensed personnel eligible to work in Texas will provide clinical services.  Each position shall have a specific job description.  PNA accepts the requirements of the LBI (Limited Background Investigation) as outlined in the IGA or Statement of Work.

4.     A minimum of one individual licensed or credentialed and eligible to work in Texas will be scheduled on each shift.  LVNs will assist with coverage for pill call, nurse sick call, treatments and segregation rounds, medical observation rounds, emergency assessments and assistance with provider sick call.  The

Health Services Administrator will be on duty forty hours per week and available by telephone or pager at all times. Clerks and Patient Care Assistants will provide assistance with record keeping, maintenance of the Health Record System and other duties.

5.     A Physician and/or Mid-Level Provider will provide direct patient care. The Physician shall be the Facility Medical Director, and provide 24-hour on-call consultation. A dentist, dental hygienist and dental assistant will provide routine dental services.   Appropriately credentialed mental health staff will provide psychological services with supervision by a licensed doctoral-level psychologist. A consulting psychiatrist is available.

6.     PNA will provide employee training in accordance with JCAHO and ACA standards, to include pre-employment training.   PNA staff will receive an orientation to the facility, Health Services Unit and PNA policies after hiring. Additional training opportunities will be provided and PNA will establish a medical library at the Facility. All staff providing direct patient care will be BLS certified and required to successfully master PNA's required core competencies.

7.     PNA's in-house 'travel nurses' will obtain BOP clearance, as will PNA's two Vice Presidents of Nursing, the Vice President of Operations, and the Vice President of Medical Staff.

## VI.   COUNTY RESPONSIBILITIES

A.     The County shall provide and maintain the original equipment, space, furniture, and fixtures required for the operation of the Health Services Unit.

B.     All equipment and supplies used in providing services herein which are purchased by the County or were available for use at the Facility by PNA as of the effective date of this Agreement, shall remain the property of the County or the Facility upon termination of this Agreement.

C.     The County will provide security for PNA's employees and agents consistent with the security provided other staff at the Facility.  Such services shall include, but are not limited to, the County providing a corrections officer at the Health Services Unit anytime an Inmate is being held, evaluated or treated by PNA personnel.  The County is solely responsible for providing security services for inmates while they are in the Health Services Unit or locations off the facility.

D.     The County will provide transportation of Inmates for non-emergency Health Services.

E.     The County shall provide or make available all BOP Policy Manuals, Program Statements, Technical Reference Manuals, forms, logs or other documentation

*Medical Services Agreement R-1/R-2 CAR 6 - Reeves County Commissioners Court - January 2007*
*The information contained herein is proprietary and confidential and not for public dissemination.*

21

referenced in the BOP IGA or Statement of Work required to operate the Health Services Unit in compliance with the Standards.

F.     Prior to the execution of this Agreement, the County shall provide PNA with copies of its Health Services Staffing Plan, described in, and required by, the BOP Statement of Work and thereafter, shall provide PNA with copies of all changes thereto, within five (5) days of the date such changes become effective.

G.     The County is responsible for the cost of all prescribed medications and "lab services," as outlined elsewhere.

## VII.    MEDICAL DISASTER PLAN:

PNA will participate with the County in designing disaster plans for a variety of scenarios that may be encountered in the correctional environment in general and in this particular geographic location. Plans will include procedures for the delivery of Health Services in the event of a disaster such as fire, tornado, hurricane, epidemic, riot, strike or mass arrests. The plans will include call down communication rosters, areas designated for medical use, location and inventory of emergency supplies, evacuation plans and other pertinent information. Drills will be held according to Standards.

## VIII.   NON-DISCRIMINATION:   During the performance of the responsibilities outlined in the RFP, PNA will:

A.     Not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin.

B.     Take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, religion, sex, or national origin.  This shall include, but not be limited to, (i) employment, (ii) upgrading, (iii) demotion, (iv) transfer, (v) recruitment or recruitment advertising, (vi) layoff or termination, (vii) rates of pay or other forms of compensation, and (viii) selection for training, including apprenticeship.

C.     Post in conspicuous places available to employees and applicants for employment the notices, to be provided by the County, which explain this clause.

D.     In all solicitations or advertisement for employees placed by or on behalf of PNA, state that all qualified applications will receive consideration for employment without regard to race, color, religion, sex, or nation origin.

## VIII.   INSURANCE AND INDEMNIFICATION

A.     <u>Insurance.</u>  PNA shall obtain, maintain, and keep in force the applicable insurance coverage required by the BOP IGA and Statement of Work, including but not limited to coverage for civil rights violations.  However, notwithstanding any

other obligation expressed herein to provide insurance coverage, PNA is not obligated to provide: (a) Insurance coverage against violations of civil rights arising from the performance by the County of its obligations under the Operating Agreement; or (b) Commercial property insurance to include rental interruption coverage.    PNA will name the County as an additional insured under such insurance coverage that PNA is required to provide hereunder, and the County shall be entitled to all notices under all insurance policies covering claims that may arise hereunder. PNA shall furnish the County with certificates of insurance establishing the required coverage prior to providing the Health Services at the Facility. The County shall be entitled to thirty days written notice prior to any reduction in coverage or termination of coverage, except that the County shall receive ten (10) days notice of cancellation for non-payment of premiums. The County shall be exempt from, and in no way liable for, any sums of money that may represent a deductible in any insurance policy obtained by PNA.    The payment of such deductible shall be the sole responsibility of PNA.

B.      <u>Defense of claims alleged against The County and the BOP</u>.  PNA shall defend and save harmless the County and the BOP, and their respective agents, officials and employees, from any and all claims, requests, assertions, demands, suits, proceedings, and causes of action of every kind and description which may be brought, asserted or made against the County or the BOP on account of:  (i) PNA's performance of this Agreement (or failure to perform); (ii) PNA's or its affiliates' violation of any laws, negligent act, omission or gross misconduct; (iii) PNA's or its affiliates' breach of this Agreement; or (iv) a loss of or damage to any property or for injuries to or death of any person, caused by, arising out of, or contributed to, in whole or in part, by reason of any alleged  act, failure to act, omission, professional error, fault, mistake, negligence or gross misconduct of PNA, its employees, agents, representatives, or subcontractors, or employees, agents, or representatives of the subcontractor in connection with or incident to the performance of this Agreement, or arising out of workers' compensation claims or claims under similar such laws or obligations.  PNA's obligations to defend the County and the BOP under this Section shall not extend to any portion of any claim, request, assertion, demand, suit, proceeding or cause of action alleged to have arisen from, or alleged to have been caused, in whole or in part, by the negligence or gross misconduct (including the failure to act) of the County, the BOP or their respective agents, representatives or employees. Any provisions or limits of insurance set forth in this Agreement hereunder, shall not limit PNA's liability pursuant to this Article VIII.  If PNA is obligated to provide a defense hereunder, and fails to provide such a defense, then the County may provide such defense and PNA shall be obligated to pay and reimburse the County for the costs and fees of said defense to the same extent that PNA was obligated to provide said defense hereunder.

C.      <u>Indemnification of claims Proven against The County and the BOP</u>.  PNA shall indemnify and hold harmless the County and the BOP, and their respective agents, officials and employees, from any and all claims, requests, assertions,

demands, suits, actions, proceedings, loss, cost, and damages of every kind and description, including any attorney fees and/or litigation expenses, which may be brought or made against or incurred by the County or the BOP on account of: (i) PNA's performance of this Agreement (or failure to perform); (ii) PNA's or its affiliates' violation of any laws, negligent act, omission or gross misconduct; (iii) PNA's or its affiliates' breach of this Agreement; or (iv) a loss of or damage to any property or for injuries to or death of any person, caused by, arising out of, or contributed to, in whole or in part, by reason of any Proven alleged act, failure to act, omission, professional error, fault, mistake, negligence or gross misconduct of PNA, its employees, agents, representatives, or subcontractors, or employees, agents, or representatives of the subcontractor in connection with or incident to the performance of this Agreement, or arising out of workers' compensation claims or claims under similar such laws or obligations.  For purposes of this Article VIII, "Proven" means a court of competent jurisdiction has ruled on the matter or the parties have entered into a settlement agreement.  PNA's obligations to defend and indemnify the County and the BOP under this Section shall not extend to any portion of any claim, request, assertion, suit, proceeding, cause of action, or demand Proven or alleged to have arisen from, or Proven or alleged to have been caused, in whole or in part, by the negligence or gross misconduct (including the failure to act) of the County, the BOP or their respective agents, representatives or employees.  Any provisions or limits of insurance set forth in this Agreement hereunder, shall not limit PNA's liability pursuant to this Article VIII.

D.  <u>Defense of claims alleged against PNA</u>.  The County shall defend PNA and its agents, officials and employees, from any and all claims, requests, assertions, demands, suits, proceedings, and causes of action of every kind and description which may be brought, asserted or made against PNA on account of: (i) the County's performance of this Agreement (or failure to perform); (ii) The County's or its affiliates' (not including PNA) violation of any laws, negligent act, omission or gross misconduct; (iii) The County's or its affiliates' (not including PNA) breach of this Agreement; or (iv) a loss of or damage to any property or for injuries to or death of any person, caused by, arising out of, or contributed to, in whole or in part, by reason of any alleged act of negligence or gross misconduct by the County, its employees, agents, representatives, or subcontractors (excluding PNA), or employees, agents, or representatives of the subcontractors (excluding PNA) in connection with or incident to the performance of this Agreement.  The County's obligations to defend PNA under this Section shall not extend to any portion of any claim, request, assertion, demand, suit, proceeding or cause of action alleged to have arisen from, or alleged to have been caused, in whole or in part, by the negligence or gross misconduct (including the failure to act) of PNA or its agents, representatives or employees.  Any provisions or limits of insurance set forth in this Agreement hereunder, shall not limit the County's liability pursuant to this Article VIII.  If the County is obligated to provide a defense hereunder, and fails to provide such a defense, then PNA may provide such defense and the County shall be obligated to pay and reimburse

PNA for the costs and fees of said defense to the same extent that the County was obligated to provide said defense hereunder.

E.   <u>Indemnification of claims Proven against PNA</u>.  The County shall indemnify and hold harmless PNA and its agents, officials and employees, from any and all claims, requests, assertions, demands, suits, actions, proceedings, loss, cost, and damages of every kind and description, including any attorney fees and/or litigation expenses, which may be brought or made against or incurred by PNA on account of:  (i) The County's performance of this Agreement (or failure to perform); (ii) The County's or its affiliates' (not including PNA) violation of any laws, negligent act, omission or gross misconduct; (iii) the County's or its affiliates' (not including PNA) breach of this Agreement; or (iv) a loss of or damage to any property or for injuries to or death of any person, caused by, arising out of, or contributed to, in whole or in part, by reason of any Proven alleged act of negligence or gross misconduct by the County, its employees, agents, representatives, or subcontractors (excluding PNA), or employees, agents, or representatives of the subcontractors (excluding PNA) in connection with or incident to the performance of this Agreement.  The County's obligations to defend and indemnify PNA under this Section shall not extend to any portion of any claim, request, assertion, suit, proceeding, cause of action, or demand Proven or alleged to have arisen from, or Proven or alleged to have been caused, in whole or in part, by the negligence or gross misconduct (including the failure to act) of PNA or its agents, representatives or employees.  Any provisions or limits of insurance set forth in this Agreement hereunder, shall not limit the County's liability pursuant to this Article VIII.

F.   Neither of the Parties hereto shall waive, release, or otherwise forfeit any possible defense that either of them may have without the consent of the other Party relative to any of the claims for which either Party may be obligated to provide a defense or indemnification hereunder.   Both Parties shall preserve all such available defenses and cooperate with the other Party to make such defenses available for each other's benefit to the maximum extent allowed by law.

G.   Either Party that seeks indemnification or defense under this Agreement shall, within ten (10) business days after being notified of the claim, notify the other Party of any claim for which it will demand indemnification or a defense under this Agreement.   The indemnifying party shall have the right to assume the defense of a claim, demand, suit, proceeding or other action pursuant to the provisions hereof, unless (i) such claim may result in a criminal proceeding against the party seeking indemnification, (ii) such claim may result in liabilities which would not be fully indemnified hereunder, or (iii) in response to a petition by the party seeking indemnification, an appropriate court rules that the indemnifying party failed or is failing to vigorously prosecute or defend such claim.

*Medical Services Agreement R-1/R-2 CAR 6 - Reeves County Commissioners Court - January 2007*
*The information contained herein is proprietary and confidential and not for public dissemination.*

25

H.    Any party obligated to provide a defense hereunder shall do so with qualified counsel that is approved by the other party; but such approval shall not be unreasonably withheld. The party providing a defense or obligated to indemnify from a claim or cause of action hereunder shall not settle or compromise any such claim or litigation cause of action without the consent of the other party, but such consent shall not be unreasonably withheld. Likewise, the party for whom a defense or indemnification for a claim or cause of action is to be provided hereunder, shall not settle or compromise any such claim or cause of action without the consent of the other party, but such consent shall not be unreasonably withheld.

I.    If a party assumes the defense of any claims and causes of action hereunder, the parties shall cooperate in such defense and shall make available all relevant records and take such other action and sign such documents as are reasonably necessary to defend such claims and causes of action in a timely manner. If the party being indemnified shall be required by judgment or a settlement agreement to pay any amount in respect of any obligation or liability against which the indemnifying party is required to indemnify under this Agreement, the indemnitor shall promptly reimburse the indemnitee in an amount equal to the amount of such payment plus all expenses (including legal fees and expenses).

## IX.    INDEPENDENT CONTRACTOR STATUS

In PNA's performance of its duties and responsibilities under this Agreement, it is mutually understood and agreed that the PNA is at all times acting and performing as an independent contractor. The County shall neither have nor exercise any control or direction over the methods by which the PNA shall perform its work and functions other than as provided herein. Nothing in this Agreement is intended to or shall be deemed to constitute a partnership or a joint venture between the parties.

## X.    MEETINGS

Meetings will be held regularly between PNA and the County. Participating will be the a County Representative, the Warden, a member of PNA Corporate staff (or other representative selected by PNA) and other representatives as reasonably requested by the Parties. The location of the meetings shall be determined by the Parties, but may be held electronically or in person.

## XI.    MONTHLY PAYMENTS

A.    The first year fee ("Monthly Operating Price") to be paid to PNA for Health Services shall be $5.85 per Inmate per day up to 90% inmate capacity, with a Fixed Incremental Unit Price (FIUP) of $5.25 per inmate per day for any and all inmates exceeding the 90% occupancy rate.

B.    *DELETED PROVISION-MUTUALLY AGREED*

C.   The second year fee of the base period will be $5.94, with a FIUP of $5.33; the third year fee $6.03 with a FIUP of $5.41, and the fourth year fee $6.12 with a FIUP of $5.49.

D.   The first year of Option Period One will be $6.30 with a FIUP of $5.65; the second year $6.49 with a FIUP of $5.82.

E.   The first year of Option Period Two will be $6.68 with a FIUP of $6.00; the second year $6.88 with a FIUP of $6.18.

F.   The first year of Option Period Three will be $7.09 with a FIUP of $6.36; the second year $7.30 with a FIUP of $6.56.

G.   The Monthly Operating Price (or FIUP) shall also be paid to PNA for each day a County Inmate is housed in the Facility, if such occurs.

H.   The Monthly Operating Price (or FIUP) to be paid to PNA for Health Services shall be for the number of Inmates in the Facility per day as indicated on the Midnight Count Report, up to 90% capacity. The Fixed Incremental Unit Price is to be paid per day per inmate for all inmates exceeding the 90% capacity figure.

a.) Either fee, as applicable, shall also be paid to PNA for each day that a County Inmate is housed in the Facility. PNA may submit to the County a proposed price adjustment to the Operating Price or FIUP for consideration during the annual rate negotiations between the County and the BOP. If PNA and the County are unable to reach an agreement regarding PNA's proposed price adjustment, then PNA either party hereto shall have the option to terminate this Agreement upon thirty days written notice to the other party.

I.   PNA will invoice the County on a monthly basis, in a form approved by the County, incorporating all payment requests in one uniform billing for services rendered for the preceding month ended. On or before the 3rd day of each month, the County shall provide PNA with such reports and occupancy information for the preceding month as may be reasonably required by PNA to create its invoice to the County for providing Health Services to any and all Inmates housed in the Facility.

J.   The County will pay PNA within thirty days after the receipt of an invoice. Failure of PNA to submit appropriate information on the invoice will result in the withholding of any disputed portion of the invoice until such time as the County receives the information. If any amounts to be paid pursuant to the invoice are disputed by the County, then the County, on or before the date the invoice is to be paid, shall advise PNA of the basis for the dispute and pay the amount of the

invoice, which is not in dispute.  The parties will resolve the disputes pursuant to the procedure set out in Section XV.C: Disputes.

K.     PNA may submit to the County a proposed price adjustment to the Per Diem Rate for consideration during the annual per diem rate negotiations between the County and BOP.  If PNA and the County are unable to reach an agreement regarding PNA's proposed price adjustment, then either party hereto shall have the option to terminate this Agreement upon thirty days (30) written notice to the other party.

## XIII. ASSIGNMENT OF AGREEMENT

PNA shall not assign this Agreement without the written consent of the County.

## XIV. CONTRACT MODIFICATIONS

Except as otherwise provided herein, modifications to this Agreement would be valid only by a written signed mutual agreement of the Parties.

## XV. TERMINATION

A.     In addition to any other right of termination set forth herein, either party shall have the right to cancel, terminate or suspend this Agreement, in whole or in part, with or without cause, by providing the other party *one hundred eighty  (180)* days written notice of termination.

B.     If a party breaches this Agreement the non-breaching party shall give the breaching party thirty days written notice of the breach.  If the breaching party does not cure the breach within the thirty-day period, the non-breaching party may terminate this Agreement immediately without further notice.

C.     In the event the County ceases to own or operate the Facility, the County may terminate this Agreement upon no less than twenty-four (24) hours notice in writing to PNA.  Said notice shall be delivered by certified mail, return receipt requested, or in person with proof of delivery.  The County shall be the final authority as to its determination as to the cessation of its ownership or operation of the Facility.

D.     Upon termination of a Contract for any reason, including expiration, PNA shall:

* Cooperate with the County in a joint inventory of supplies and equipment;
* Satisfy all PNA's debts and obligations incurred at the Facility; and
* Allow access to representatives of a successor contractor to interview current staff for positions with such successor.

E.   Notwithstanding the forgoing, the following provisions will survive any termination or expiration of a Contract: V.B.6; V.E.1 & 2; V.H.6(c); V.H.9; V.Q.2; IX; XVI.H.2., and XVI.K.

F.   Neither the anticipated termination nor expiration of a Contract would relieve PNA from the obligation to provide or arrange for Health Services until the date of termination.

G.   In the event that BOP terminates the IGA, then PNA or the County may terminate this Agreement upon thirty days written notice to the other party.

## XVI.   MISCELLANEOUS

A.   Third Party Rights

The provisions of this Agreement will be for the sole benefit of the parties hereto and will not be construed as conferring any rights on any other person.

B.   Notice

All notices, designations, consent, offers, acceptance or any other communication provided for herein required to be in writing shall be given by certified mail, return receipt requested, addressed to the parties as shown below:

PNA:      Vernon "Trey" Farthing
          President
          Physicians Network Association
          1622 Mac Davis Lane, Suite A
          Lubbock, Texas 79401

County:   The Honorable Sam Contreras
          County Judge
          Reeves County
          100 East Fourth Street
          Pecos, TX 79772

C.   Disputes

1.   Any dispute between PNA and the County relating, directly or indirectly, to this Agreement or the relationships or duties contemplated by this Agreement (including the viability or enforceability of this Section XV.C. Disputes) shall be resolved pursuant to the terms of this Section XV.C. Disputes, and this shall be the sole and exclusive remedy of the parties hereto.

2.   Either party hereto shall provide the other with written notice of the dispute to be resolved ("Dispute Notice") and shall deliver such notice to the

*Medical Services Agreement R-1/R-2 CAR 6 - Reeves County Commissioners Court - January 2007*
*The information contained herein is proprietary and confidential and not for public dissemination.*

29

other party pursuant to Section XV.B. Notice.  The date the Dispute Notice is placed in the mail, or hand delivered to the receiving party, shall be the Dispute Notice Date.  The receiving party shall promptly forward the Dispute Notice to the County Judge (or designee.)  Within thirty days after the Dispute Notice Date, the Judge or designee shall make a decision concerning such dispute.  In the event that the decision is not acceptable to PNA or the County shall be mediated pursuant to Section XV.C.3, below.

3.      If the dispute is not resolved by the procedures set forth above, then, within forty-five (45) days of the Dispute Notice Date, either party may submit the dispute to mediation pursuant to Section 154 of the Texas Civil Practice and Remedies Code.  In the event that either party is not satisfied with the result of the mediation, then and only then, either party may *file a lawsuit in Reeves County, Texas.*

4.      *DELETED PROVISION-MUTUALLY AGREED*

5.      *DELETED PROVISION-MUTUALLY AGREED*

D.      Waiver:  Either party's waiver of unsatisfactory services or the breach of any provisions of this Agreement shall not be deemed to be a waiver of any other breach and shall not be construed to be a modification of the terms of this Agreement.  No waiver shall be valid or binding unless the same shall be in writing and signed by the party alleged to have granted the waiver.  The provisions herein do not limit a party's right to remedies at law or to damages.

E.      State Law:  This Agreement shall be construed under and in accordance with the laws of the State of Texas, and all obligations created hereunder are performable in Reeves County, Texas.  Any court proceeding permitted by this Agreement shall be filed only in *Reeves* County, Texas.

F.      Force Majeure:  In case performance of any terms or provisions herein shall be delayed or prevented because of compliance with any law, decree, or order of any governmental agency or authority, either local, state, or federal, or because of war, riot, public disturbances, strikes, lockouts, differences with workmen, fires, floods, Acts of God, or any other reason whatsoever which is not within the control of the party whose performance is interfered with and which, by the exercise of reasonable diligence said party is unable to prevent, the party so suffering may at its option suspend, without liability, the performance of its obligations hereunder during the period such cause continues, and extend the term of this Agreement for the period of such suspension of the performance of duties hereunder.

G.  **Severability:** If any provision hereof is deemed to be invalid or unenforceable under applicable law, this Agreement shall be considered divisible as to such provision and the same shall thereafter be inoperative, provided however, the remaining provisions of this Agreement shall be valid and binding.

H.  **Compliance with IRCA**

1.  PNA agrees at all times to remain in strict compliance with all terms, provisions, regulations, and rulings relative to the Immigration Reform and Control Act of 1986 (IRCA). All employees of PNA assigned to the Facility will have had their identity and eligibility for work within the United States properly verified. Within three (3) days of receipt of a written request from the County, PNA shall provide copies of the I-9 form or such other documentation as may be appropriate to satisfy the County as to PNA's compliance with IRCA.

2.  PNA agrees to defend and indemnify the County and its agents, their affiliates and subsidiaries, and their directors, partners, officers, agents, representatives, and employees from and against any claims, actions, suits or proceedings of any type whatsoever arising out of or in any way connected with PNA's breach of the terms of the paragraph immediately above.

I.  **Compliance with Safety Regulations:** PNA shall plan for, and ensure, that all personnel comply with the basic provisions of OSHA Safety and Health Standards as such federal regulations are applicable to the Health Services (if any). The responsibility for the implementation and enforcement of health and safety requirements relating to Health Services lies with PNA, and its safety support staff.

J.  **Execution Authority:** By his signature below, each signatory individual certifies that he or she is the properly authorized agent or officer of the applicable party hereto and has the requisite authority necessary to execute this Agreement on behalf of such party, and each party hereby certifies to the other that any resolutions necessary to create such authority have been duly passed and are now in full force and effect.

K.  **Additional PNA Representations.** PNA hereby represents and warrants to and for the benefit of the County that all of the representations and warranties given by PNA to the County as set forth in this Agreement are true in relation to PNA as of the date of this Agreement and will continue to be true throughout the term of this Agreement.

L.  **Entire Agreement.** This Agreement is the entire agreement between the Parties hereto, and wholly supercedes any and all prior or contemporaneous drafts, discussions, negotiations, communications, proposals or agreements, of every nature, relating to any of the issues or subjects addressed in this Agreement.

*Medical Services Agreement R-1/R-2 CAR 6 - Reeves County Commissioners Court - January 2007*
*The information contained herein is proprietary and confidential and not for public dissemination.*

31

M.    **Attorneys' Fees.** If it shall become necessary for either party to engage attorneys to institute legal action for the purposes of enforcing its rights hereunder, the party prevailing in such litigation shall be entitled to receive all of its fees and expenses from the losing party.

N.    **Confidentiality.** Each party agrees to keep any proprietary information disclosed by the other party confidential. Information is proprietary if it is identified as such in writing.

O.    **Counterparts.** This Agreement may be executed in multiple counterparts each of which shall constitute but one Agreement.

*(The balance of this page has been intentionally left blank.)*

**IN WITNESS WHEREOF,** the parties have executed this Agreement in their official capacities with legal authority to do so.

**FOR REEVES COUNTY**

By _Sam Contreras_

The Honorable Sam Contreras
County Judge

Date _3-12-07_

**PHYSICIANS NETWORK ASSOCIATION**

By _[signature]_

Vernon "Trey" Farthing
President and Chief Executive Officer

Date _3-12-07._

*Medical Services Agreement R-1/R-2 CAR 6 - Reeves County Commissioners Court - January 2007*
*The information contained herein is proprietary and confidential and not for public dissemination.*

33

## EXHIBIT B

## Corporate Qualifications/References

Physicians Network Association, a professional corporation, was founded in 1990 in Lubbock, TX, and is wholly owned by Dr. Vernon Farthing, M.D., a Board-certified Internal Medicine specialist.  PNA currently provides health care to over 15,000 inmates in 24 facilities in three states, including over 5,000 in Federal Bureau of Prisons (BOP) or U. S. Marshals Service (USMS) custody.  PNA also provides full-spectrum health services to clinics, hospitals and long-term care facilities.

PNA's Corrections Division contracts with local and state government entities as well as private correctional management firms.  We care for male and female adults and juveniles, and have extensive experience with special needs populations, including mentally, chronically or terminally ill individuals, in a variety of environments.

We believe that PNA has the experience to provide Reeves County and the Bureau of Prisons excellent, cost-effective and constitutionally appropriate care.  PNA's financial stability, extensive purchasing networks, experienced executive staff and commitment to customer service makes us distinctive in the field of correctional healthcare.  Our size makes it easy for us to continue to be your active partner.  Our goal is to tailor our services to your needs and goals.

PNA is able to deliver quality service at a reasonable cost because of several reasons: one, we are a privately held company.  Two, we have eliminated tiers of bulky, expensive middle management. Three, our goal-aligned Physician-President has provided years of direct inmate care and works closely with facility wardens.  We have a deep understanding of inmates' healthcare needs.  Our executive staff is empowered to make immediate operational decisions. PNA's continual scrutiny of expenses and aggressive negotiations with suppliers, providers and hospitals help maintain our low costs.  Higher employee wages reduce recruitment expense. Our concentration on the Southwestern United States market means a rapid response from our central West Texas location.  Our expansive network of nurses, physicians and midlevel providers throughout Arizona, New Mexico and Texas ensures minimal staff shortages and prompt response in emergencies.

Our clients will confirm that they receive personal attention from executive decision makers. Our Wardens and Administrators appreciate PNA's philosophy of providing quality, cost-effective care and personal service.  We are recognized for our responsiveness to the needs of our customers.   PNA works as your partner to ensure appropriate healthcare without compromising operations.  As a subcontractor, PNA has fourteen years' experience assisting operators exceed expectations.  We welcome regular audits and can meet the requirements of any custody agency.

PNA is fiscally sound with a reputation for prompt payment to vendors, suppliers and personnel. Members of our professional staff of over 450 are long-time employees who enjoy premium working conditions, competitive pay and excellent benefits, which results in minimal turnover.

*Medical Services Agreement R-1/R-2 CAR 6 - Reeves County Commissioners Court - January 2007*
*The information contained herein is proprietary and confidential and not for public dissemination.*

35

Because of our numerous facilities in Texas, PNA has a large labor pool available when additional staff is needed.

PNA currently contracts with Management and Training Corporation (MTC), the GEO Group, the Cornerstone Group, and state, city and county entities. In the past, PNA has contracted with Correctional Services Corporation (CSC), Youth Services International (YSI,) Corrections Corporation of America (CCA,) the Bobby Ross Group, and Emerald Corrections.

PNA has never had a contract canceled or been removed from a facility. We have operated the Lubbock County Jail and Lubbock County Juvenile Justice Center since 1994, the West Texas Intermediate Sanction Facility since 1997 and the Dalby Unit since it opened in 1999. A keynote in PNA's operation is our commitment to working with the contracting agency. Our goal is to assist the contractor in providing quality, cost-effective services to government agencies requiring detention services. PNA is proud of its record of no substantiated grievances in any facility.

PNA's depth of experience is unusual: our contracts range from professional staffing of a jail clinic to a full-risk, full-spectrum medical, mental and dental care contract for a 2000-bed Federal BOP facility. We have twelve years of experience with out-of-state inmate management, as well as extensive maximum-security juvenile, dual-diagnosis/mental retardation inmates, and community corrections-based health care. PNA is willing to accept challenging or remote facilities and emergency assumptions. We were on-site at the Polk City and Cypress Creek (FL) Youth Development Centers (CSC/YSI facilities) ten days after first contact with the operators.

PNA has achieved initial ACA or NCCHC accreditation at the majority of our facilities and was one of the first private health providers to achieve JCAHO (Joint Commission on Accreditation of Healthcare Organizations) accreditation at a Bureau of Prisons institution with a score of 97. Additionally, we successfully achieved accreditation in 2003 at the South Texas ISF as a test site under the ACA Adult Local Detention Facilities Standards, 4th Edition, and a perfect score under ACA ALDF Standards, 3rd Edition at Santa Fe County Adult Detention Center.

PNA provides all levels of professional staffing, including physicians, mid-level providers, Nurses and Nurse Aides, EMTs and Record Clerks. We also provide pharmacy, radiology and laboratory services, full dental care and comprehensive mental health programs with skilled licensed practitioners, including psychologists and psychiatrists. PNA's on site indirect care includes Quality Assurance and Utilization Management as well as 24-hour on-call physician services and comprehensive emergency pharmaceutical services.

PNA has four Quality Assurance/Quality Improvement experts in the corporate office. As mentioned above, regular auditing by outside agencies provides a lot of input. We also, because almost all of our contracts have some modified off-site compensation (full-, partial or no risk,) are aggressive in monitoring utilization. Two corporate employees and Dr. Farthing handle Utilization Management and provide a two-day turn around for decisions on routine services and immediate assistance with urgent requests. Peer review is required in all our facilities and we have a team of Board Certified specialists who provide this service.

## References:

Dr. Ellen Yankellow, PharmD
President
CorrectRX Pharmacy Services
803-A Barkwood Court
Linthicum, MD 21090
(410) 636-9741
Dr. Yankellow is our primary pharmacy subcontractor and knows our industry reputation.

Mr. Don Houston
Vice President – Central Region
The GEO Group, Inc.
1583 Common Street, Suite 213
New Braunfels, TX 78130
(830) 625-9000
PNA provides services to GEO at ten facilities (six in Texas,) in addition to working with them at Reeves County Detention Center Units R-1/R-2 and R-3.

Sheriff David Gutierrez
Lubbock County Sheriff's Office
801 Main Street
Lubbock, TX
(806) 775-1498
Operates the Lubbock County Jail, Lubbock County Juvenile Justice Center and Lubbock County Community Correctional Facility

Mr. Scott Marquardt, President
Management & Training Corporation
P. O. Box 10
500 North Marketplace Drive
Centerville, UT 84014
(801) 693-2800
Management & Training Corporation is the operator of the West and East Texas Intermediate Sanction Facilities, Dalby Correctional Facility, Otero County Prison Facility, Willacy County Detention Center and Arizona State Prison - Kingman

Mrs. Anne Cybulski-Sandlian
Medical Services Director
State of Wyoming
(307) 777-5818
PNA provided services for Wyoming female inmates in the McKinley County Jail, Gallup, NM Wyoming males at the Bill Clayton Detention Center in Littlefield, TX.

*Medical Services Agreement R-1/R-2 CAR 6 - Reeves County Commissioners Court - January 2007*
*The information contained herein is proprietary and confidential and not for public dissemination.*

37